**PUBLIC CITIZEN, Sierra Club, and Friends of the Earth, Plaintiffs,**

v.

**OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, Defendant.**

Civ. A. No. 92–2102 (CRR).

United States District Court, District of Columbia.

June 30, 1993.

As Amended July 1, 1993.

Patti Goldman, with Alan B. Morrison and Paul R.Q. Wolfson, of the Public Citizen Litigation Group, for plaintiffs.

Bradley M. Campbell, with Samuel C. Alexander of the U.S. Dept. of Justice, Environmental and Natural Resources Div., and Roger B. Clegg, Acting Asst. Atty. Gen. and Benedict S. Cohen, Acting Deputy Asst. Atty. Gen., for defendant.

CHARLES R. RICHEY, District Judge.

## I. INTRODUCTION

Before the Court are the parties' Cross Motions for Summary Judgment in the above-captioned case. In their Complaint, the Plaintiffs allege that the Defendant has failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, in the negotiation and conclusion of the North American Free Trade Agreement ("NAFTA"). More specifically, the Plaintiffs challenge the Defendant's failure to prepare an environmental impact statement ("EIS") on the NAFTA and request that the Court order the Defendant to produce an EIS on the NAFTA before the President submits it to Congress. The NEPA requires that all federal agencies prepare an EIS for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

The Court held oral argument on the motions on May 25, 1993. After careful consideration of the papers filed by the parties, the arguments of counsel at the hearing, the underlying law, and the entire record in this action, the Court shall grant the Plaintiffs' Motion for Summary Judgment.

## II. BACKGROUND

In 1991, the United States began trilateral negotiations with Canada and Mexico with the goal of establishing a North American free trade zone. *See* 56 Fed.Reg. 32, 454–55 (July 16, 1991). These negotiations resulted in the NAFTA, a comprehensive document affecting every aspect of trade among the three countries. The NAFTA was signed by the trade representatives of the United States, Mexico and Canada on October 7, 1992.[1]

---

1. The NAFTA addresses, *inter alia*, barriers to     trade, intellectual property rights, and trade in

The NAFTA is subject to the provisions of the Trade Act of 1974, as amended. *See* 19 U.S.C. § 2101 *et seq.* ("the Trade Acts"). The Trade Acts provide that the Defendant United States Office of the Trade Representative ("OTR") shall serve as the President's chief negotiator in trade matters. *Id.* § 2171(c). The NAFTA will be submitted to Congress under the "fast track" approval process.[2] *See* 19 U.S.C. §§ 2191–2194, 2902–2903. Under the fast track process, the President submits the NAFTA to Congress along with implementing legislation and an explanation of the changes in the current law. 19 U.S.C. § 2903(a)(1)(B). The NAFTA must be approved by both Houses of Congress before it can become effective, and such approval occurs when the NAFTA's implementing legislation has been enacted by both the Senate and the House of Representatives. 19 U.S.C. § 2903(a)(1). Under the fast track process, once the NAFTA has been submitted to Congress, Congress has only 60 legislative days to approve or reject the agreement, *id.* § 2191(c) and (e); legislative debate is limited to 20 hours in each House, *id.* § 2191(f) and (g); and Congress may not change the implementing legislation or the Agreement. *Id.* § 2191(d). The President has no obligation to submit the NAFTA to Congress for ratification; however, he is expected to do so some time this fall. *See* John Dillin, *Kantor Says NAFTA Will Bring More Jobs,* Christian Science Monitor, June 23, 1993, at 2 (United States Trade Representative Mickey Kantor says that NAFTA should be ready for Congress in September.)

As noted earlier, the NEPA requires an EIS for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Plaintiffs are three nonprofit groups that have taken an active interest in the environment: Public Citizen, the Sierra Club, and the Friends of the Earth. They contend that the Defendant United States Trade Representative and the NAFTA are subject to the NEPA and bring this action for declaratory relief to compel the Defendant to prepare an EIS on the NAFTA before it is submitted to Congress. The Plaintiffs allege that this Court has jurisdiction in this suit under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.,* which provides for judicial review of a final agency action by a party adversely affected or aggrieved by agency action within the meaning of a relevant statute, here the NEPA.

As the Defendant admits no EIS was prepared on the NAFTA, the question before the Court is whether the NEPA and the APA provide relief to the Plaintiffs under these circumstances. In other words, the issue before the Court is whether the NEPA and the APA properly apply to the NAFTA and the OTR's action in negotiating, drafting and ultimately approving the NAFTA on behalf of the United States. As to these issues, the Defendant claims that: 1) there is no jurisdiction over this suit under the APA; 2) the Plaintiffs have no standing in this action; and 3) the NEPA does not apply to the NAFTA. However, the Court concludes that the plain language and policies of the APA and the NEPA apply to the NAFTA and the OTR. Furthermore, the Court finds that there is jurisdiction here under the APA and that the Plaintiffs' allegations of environmental harm are sufficient for purposes of standing under the NEPA. Finally, the Court determines that the Defendant has ignored the clear language and the legislative mandate of the NEPA in failing to prepare an EIS of the NAFTA, and, therefore, the Court shall grant summary judgment for the Plaintiffs.

### III. THIS COURT HAS JURISDICTION OVER THIS ACTION UNDER THE APA BECAUSE THE DEFENDANT HAS TAKEN FINAL AGENCY ACTION IN ITS PREPARATION AND FINALIZATION OF THE NAFTA.

As a threshold matter, the Court concludes that it has subject matter jurisdiction under

---

goods. It also provides an exhaustive tariff schedule to govern trade between the three countries.

2. The fast track procedures are not statutory requirements but have been adopted as an exercise of the rule making power of the House of Representatives and the Senate. *See* 19 U.S.C. § 2191(a)(1).

the APA for the Plaintiffs' claims under the NEPA.

The same Plaintiffs filed an earlier challenge to the NAFTA in August 1991. At that time, the negotiations for the NAFTA had not yet been concluded and no agreement had been finalized. That action was dismissed by the district court. *Public Citizen v. Office of United States Trade Representative*, 782 F.Supp. 139 (D.D.C.1992) (June Green, J.). The Court of Appeals affirmed the dismissal of that action, holding that there was no jurisdiction under the APA because there had not been any final agency action under section 704 of the APA. *Public Citizen v. Office of United States Trade Representative*, 970 F.2d 916 (D.C.Cir.1992). The Circuit noted that there was no event triggering the agency's obligation to prepare an EIS because no final NAFTA agreement had been reached, as only incomplete drafts had been prepared. *Id.* at 919. Under these circumstances, our Court of Appeals believed that a suit challenging the NAFTA was premature. *Id.* The Plaintiffs now properly assert that the OTR has taken final action as to the NAFTA and there is jurisdiction under the APA in the instant action.

■ The Court begins, as our Court of Appeals did in the prior case, in analyzing the question of final agency action by examining the "NEPA itself, for it specifically identifies the time when an agency's action is sufficiently concrete to trigger the EIS requirement." *Id.* at 918. Our Court of Appeals explicitly stated that in order to challenge the NAFTA, the "[P]laintiffs must point to a specific proposal for legislation or other action 'at least arguably triggering the agency's obligation to prepare an impact statement.'" *Id.* at 918–19, *quoting Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 85 (D.C.Cir.1991). In rejecting the Plaintiffs' earlier claim, our Court of Appeals explicitly noted that no final agreement had yet been produced in NAFTA negotiations and that it was unclear whether the negotiations would ever produce a final agreement. *Id.*

However, it is undisputed that the NAFTA agreement has now been finalized and signed by the United States, Canada, and Mexico. It is also undisputed that the NAFTA signed by the three countries is the same agreement that will be sent to Congress. Furthermore, under the fast track procedure, the agreement itself cannot be changed after it has been sent to the Congress for ratification. 19 U.S.C. § 2191(d).[3] Therefore, the Court concludes that the NAFTA agreement constitutes final agency action under the APA for purposes of this lawsuit.

**A. THIS COURT HAS APA JURISDICTION BECAUSE THE DEFENDANT OFFICE OF TRADE REPRESENTATIVE IS AN AGENCY UNDER THE APA AND BECAUSE THE DEFENDANT HAS HAD SIGNIFICANT INVOLVEMENT IN THE PREPARATION, NEGOTIATION, AND DRAFTING OF THE NAFTA.**

■ However, this does not end the Court's inquiry under the APA as the Defendant raises a related argument regarding jurisdiction that must be addressed as a threshold matter. The Defendant contends that there is no APA jurisdiction in this case because the President, and not the Defendant, is responsible for any final agency action on the NAFTA and there is no APA jurisdiction to review actions by the President. Defendant's Memorandum in Support of its Motion, at 15; *see Armstrong v. Bush*, 924 F.2d 282 (D.C.Cir.1991) (no APA jurisdiction to challenge the actions of the President). More specifically, the Defendant claims that APA jurisdiction is improper here because: 1) the NAFTA is actually a result of the President's efforts, and not that of the OTR for purposes of the APA and the NEPA; 2) the final agency action with regard to the NAFTA is its submission to Congress by the President and not simply its negotiation and the production of a final agreement; and 3) the President has no obligation to submit the NAFTA to Congress. However, the Court is not persuaded that

---

**3.** Various side agreements are being negotiated by the three countries on topics related to the NAFTA. However, the Defendant does not claim

that the NAFTA itself is not a final agreement by virtue of the negotiation of these side agreements.

such arguments preclude APA jurisdiction in this case and believes that the Defendant's arguments misread the language of the applicable statutes and the case law. The Court shall address each of these arguments in turn.

First, the Court concludes that the NAFTA is, in substantial part, a result of the work of the Defendant OTR and therefore reviewable under the APA and the NEPA. The Defendant Office of the United States Trade Representative is charged by statute with the responsibility for conducting international trade negotiations, developing and coordinating United States trade policy and imposing any retaliatory trade sanctions on other countries. *See* 19 U.S.C. §§ 2171, 2411–2417. It is undisputed that the Defendant OTR has, in substantial part, negotiated and drafted the NAFTA.

The Court again looks to the language and case law under the NEPA in order to understand whether the Defendant's actions regarding the NAFTA constitute final agency action under the APA. Under the NEPA, a federal agency is still required to prepare an EIS even if a project or proposal is not exclusively a federal agency endeavor. *See Colorado River Indian Tribes v. Marsh,* 605 F.Supp. 1425 (C.D.Cal.1985); *cf. Sierra Club v. Marsh,* 769 F.2d 868 (1st Cir.1985) (where U.S. Corps of Engineers granted a permit for part of a construction project, an EIS was required on the entire project). Furthermore, the Council for Environmental Quality ("CEQ"), which was established by the NEPA, has issued regulations pertaining to the NEPA and its interpretation of the NEPA is entitled to substantial deference. *Andrus v. Sierra Club,* 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979) (citations omitted); *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332,

355, 109 S.Ct. 1835, 1848, 104 L.Ed.2d 351 (1989). The CEQ's regulations specifically provide that, for purposes of the NEPA, legislation:

> **includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a federal agency.... The test for significant cooperation is whether the proposal is in fact predominately that of the agency rather than another source.... Proposals for legislation include requests for ratification of treaties.**

40 C.F.R. § 1508.17 (1992); *see Andrus,* 442 U.S. at 357, 99 S.Ct. at 2341. The Court also notes that the CEQ regulations provide that major federal actions under NEPA include projects and programs entirely or partially conducted by federal agencies. 40 C.F.R. § 1508.18(a) (1992). Therefore, the significant actions taken by the Defendant OTR in negotiating and drafting the NAFTA are sufficient to trigger the EIS under the NEPA.[4]

Second, the Court concludes that the mere fact that the President submits the NAFTA to Congress does not bar review under the APA in this case. The Defendant principally relies on the Supreme Court's recent decision in *Franklin v. Massachusetts,* —— U.S. ——, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), for its argument that the President's submission of the NAFTA to Congress prevents APA jurisdiction here. In *Franklin,* the Supreme Court held that there was no final agency action, and thus no jurisdiction under the APA, for the Secretary of Commerce's actions regarding the census. Under the automatic reapportionment statute at issue in that case, the Secretary of Commerce supervises the taking of the census, compiles the data and reports that information to the President. After receiving the Secretary's

---

4. The Office of the United States Trade Representative has a separate statutory basis for its authority and has many separate responsibilities aside from assisting and advising the President, *see* 19 U.S.C. § 2171, and thus, the OTR is an agency subject to the APA. *See Soucie v. David,* 448 F.2d 1067 (1971) (a component with substantial independent authority in the exercise of its functions is an agency); *see also Energy Research Foundation v. Defense Nuclear Facilities Safety Bd.,* 917 F.2d 581 (D.C.Cir.1990).

Furthermore, the Court notes that this finding is supported by the fact that the appointment of the OTR's top officials are subject to the advice and consent of the Senate, thus making them somewhat independent of the executive branch. 19 U.S.C. § 2171(b). **In addition, the OTR is an agency under the Freedom of Information Act and the Privacy Act. *See* 15 C.F.R. §§ 2004, 2005 (1993).**

report, the President then has the statutory responsibility for transmitting a statement to Congress showing the results of the census and the number of Representatives to which each state is entitled. *Id.* at ——, 112 S.Ct. at 2771. The Court in *Franklin* concluded that there was no APA jurisdiction of the Secretary of Commerce's actions because the President took the final action in reporting the census figures to Congress and such executive action was not reviewable under the APA.

The Defendant analogizes the President's submission of the census to the Congress to his submission of the NAFTA. However, such an analogy is misplaced. In *Franklin,* the Court reasoned that "[t]he core question is whether the agency has completed its decision making process, and whether the result of that process is one that will directly affect the parties." *Id.* at ——, 112 S.Ct. at 2773. The Court concluded that no decision making process was completed where the census figure supplied by the Secretary to the President was actually a "moving target, even after the Secretary reports to the President." *Id.* at ——, 112 S.Ct. at 2774. The Court noted that, even after the Secretary submits his report to the President, the census information can be amended before being transmitted to Congress, the President could instruct that the census be reformed, and that, in fact, the President was not required to adhere to the policy decisions reflected in the Secretary's report. *Id.* at ——, 112 S.Ct. at 2774–75. Thus, the census report in *Franklin* was "more like a tentative recommendation than a final and binding determination." *Id.* at ——, 112 S.Ct. at 2774. On the other hand, the NAFTA is in stark contrast to the census report in *Franklin* because *the NAFTA is a complete and, most importantly, a final product that will not be changed before submission to Congress. The NAFTA that was negotiated and signed by the Trade Representative is the same document that shall be submitted to Congress and which is the subject of this suit.*

Third and finally, the fact that the President is under no obligation to submit the NAFTA to the Congress is not a bar to APA jurisdiction. Once again, a reference to the NEPA demonstrates why the actions by the Defendant here are final for purposes of APA jurisdiction and the preparation of an EIS. As discussed earlier, the NEPA requires that *an EIS must be prepared for legislative proposals.* See *Izaak Walton League of America v. Marsh,* 655 F.2d 346 (D.C.Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981). The case law is clear that *an EIS must be prepared once such a proposal is completed and that its submission to Congress is not required. Trustees for Alaska v. Hodel,* 806 F.2d 1378 (9th Cir.1986) (noting that once Congress acts on a proposal, the aggrieved party may lose its right to judicial review). As the NEPA unambiguously requires an EIS on "proposals for legislation," 42 U.S.C. § 4332(2)(C), the Court concludes that an EIS on the NAFTA is required.

## IV. THE EXERCISE OF APA JURISDICTION UNDER THE APA IN THIS CASE IS NOT A VIOLATION OF SEPARATION OF POWERS BECAUSE THE NAFTA HAS ALREADY BEEN DRAFTED AND APPROVED BY THE THREE COUNTRIES AND THE PREPARATION OF AN EIS WILL NOT INTERFERE WITH THE PRESIDENT'S AUTHORITY.

The Defendant further argues that an exercise of APA jurisdiction in this case would violate separation of powers by infringing on the Executive's right and ability to conduct foreign policy. Defendant's Memorandum in Support of its Motion, at 20. However, such an argument is not persuasive in this case.

The Court concludes that the separation of powers doctrine does not bar the Plaintiffs' claims because an exercise of jurisdiction in this case under the APA and the NEPA is not an infringement of the powers of the President. In arguing that the EIS requirement will impede the President's power to conduct foreign policy, the Defendant conveniently ignores the fact that the power to regulate commerce with foreign nations is given to the Congress under the Constitution. *See* Constitution, Art. 1, Sec. 8, cl. 3.

Furthermore, assuming *arguendo* that the EIS requirement here raises a separation of powers question, the circumstances surrounding this lawsuit demonstrate that an application of the NEPA to the NAFTA will not impede the President's power in any meaningful way. The NAFTA is a completed document which has been signed and agreed to by the three heads of state for the United States, Canada, and Mexico. The only remaining step to be taken regarding the NAFTA is a domestic one, specifically, the submission of the NAFTA for approval by the Congress for possible ratification. The EIS requirement is, therefore, a domestic issue, where an agency must inform the relevant decision makers, in this case the Congress, of the environmental consequences of a proposal for legislation. *See* 42 U.S.C. § 4332(2)(C). Given the current posture of the NAFTA, the Court does not believe that the EIS requirement would so infringe on the President's power as to be a violation of the doctrine of separation of powers.[5]

## V. THE PLAINTIFFS HAVE STANDING TO CHALLENGE THE DEFENDANT'S FAILURE TO PREPARE AN EIS FOR THE NAFTA BECAUSE THE PLAINTIFFS ALLEGE SUFFICIENT AND COGNIZABLE INJURY.

██ The Plaintiffs claim that they have standing because the NAFTA, by its terms, will result in changes to federal and state law and policy in a variety of health and environmental matters and that these changes will have an environmental impact on them.

Furthermore, the Plaintiffs argue that NAFTA will result in environmental changes to certain geographical areas, such as the area on the border between the United States and Mexico. Under these circumstances, the Plaintiffs contend that "the Court can determine whether NAFTA is likely to harm plaintiffs." Plaintiffs' Reply Brief at 9. The Court finds that the Plaintiffs' allegations, and the affidavits submitted in support thereof, establish standing under the NEPA.

It is clearly established law that:

[t]he procedural and informational thrust of [the] NEPA gives rise to cognizable injury from denial of its explanatory process, so long as there is a reasonable risk that environmental injury may occur.

*City of Los Angeles v. National Highway Traffic Safety Admin.*, 912 F.2d 478, 492 (D.C.Cir.1990).[6] The Court agrees with the Plaintiffs that the NAFTA will create binding obligations on state and federal agencies to conform with its terms. The NAFTA, by its very terms, sets forth criteria that may form a basis for challenging various domestic health and environmental laws. *See e.g.* Plaintiffs' Exhibit A (NAFTA, Chapter 7). Those laws that are found to be contrary to the NAFTA's free trade provisions either cannot be applied or can become the basis of trade sanctions.[7] In addition, by virtue of the Supremacy Clause, a state law that conflicts with the NAFTA is preempted by the NAFTA. *See id.* (NAFTA, Article 105 (countries must "ensure that all necessary measures are taken" to comply with the

5. The Defendant's argument concerning separation of powers had more force in the prior suit regarding the NAFTA because the Plaintiffs were requesting that an EIS be completed before the conclusion of the NAFTA negotiations. *See Public Citizen v. Office of United States Trade Representative*, 782 F.Supp. 139 (D.D.C.1992) (June Green, J.). However, such a suit was dismissed on other grounds and thus no infringement of Executive power occurred.

6. In the prior suit brought by the Plaintiffs, the district court dismissed the action, holding that the Plaintiffs did not establish standing under the NEPA. *Public Citizen v. Office of U.S. Trade Representative*, 782 F.Supp. 139, 142 (D.D.C. 1992). More specifically, Judge June Green found that the Plaintiffs failed to establish standing derivatively through its members because it

could not show that members' environmental or recreational interests would be harmed by a particular agency action. *Id.* However, as discussed earlier, no final NAFTA agreement had been reached when that suit was pending and thus any allegations of harm were premature. *Public Citizen v. Office of the United States Trade Representative*, 970 F.2d 916, 919 (D.C.Cir.1992). In addition, our Court of Appeals did not reach the issue of standing in affirming the district court's dismissal. *Id.*

7. The Plaintiffs set forth numerous health and environmental measures which may be set aside as contrary to the NAFTA, thus leading to injury. These include, *inter alia*, pesticide residue standards, chemical bans, bans on seafood imports based on certain environmental criteria, and pollution controls. *See* Wallach Affidavit.

NAFTA, including compliance by "state and provincial governments")). Thus, changes in federal and state law to conform with the NAFTA may very likely result in environmental injuries to certain members of the Plaintiff organizations, particularly those in California and Wisconsin. *See* Claybrook Affidavit ¶¶ 6–8; McCloskey Affidavit ¶ 5; Wallach Affidavit ¶¶ 53–57.[8] For example, the NAFTA could serve as a basis to challenge federal and state laws, such as the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 348(c)(3)(A) & 376(b)(2), as well as California's Proposition 65, Cal.Health & Safety Code §§ 25249.5 *et seq.,* that prohibit certain carcinogens in water and food. *See* Wallach Affidavit ¶¶ 34, 55–56.

Furthermore, the Court notes that the allegations of possible environmental harm as a result of the NAFTA to members of the Plaintiff organizations who live on the United States–Mexico border region are sufficiently concrete as to establish standing. *See* Audley Affidavit ¶¶ 6, 13–20, 39–47; Perkins Affidavit ¶ 12. In particular, the Court notes that a limited free trade zone along the United States–Mexican border, known as the Maquilardora program, demonstrates that the Plaintiffs' environmental concerns are not speculative. The Maquiladora program has resulted in grave environmental problems to those people living on either side of the border. *See* Audley Affidavit ¶ 21–26. These problems are so severe that the area has been called a "virtual cesspool and breeding ground for infectious diseases...." Plaintiffs' Exhibit T, (Council on Scientific Affairs, "A Permanent US—Mexico Border

Environmental Health Commission," 263 *JAMA* 3319, 3320 (1990)). The Plaintiffs also make claims as to the air quality on behalf of their members in specific metropolitan areas, such as San Diego, California, and El Paso, Texas, and allege that air quality in these cities will suffer as a result of the NAFTA. *See e.g.,* Claybrook Affidavit ¶ 8.

In fact, as part of its work on the NAFTA, the Defendant prepared a *Review of U.S.– Mexico Environmental Issues* ("the Review"), which identifies numerous environmental issues related to the NAFTA. *See* Plaintiffs' Exhibit D. The Review confirms that the NAFTA will have significant environmental effects and acknowledges that NAFTA may worsen the environmental problems already existing in the United States–Mexico border area. *Id.,* (Executive Summary at 3–7).[9] Such allegations of injury are sufficient for standing purposes. *See Public Citizen v. National Highway Traffic Safety Admin.,* 848 F.2d 256 (D.C.Cir.1988); *National Wildlife Federation v. Hodel,* 839 F.2d 694 (D.C.Cir.1988); *Oregon Environmental Council v. Kunzman,* 817 F.2d 484 (9th Cir.1987).

The Defendant complains that many of the alleged environmental effects of the NAFTA are too widespread to be confined to a particular geographical location.[10] However, the absence of a geographical nexus does not defeat a claim of standing because that "would mean that the most injurious and widespread Government actions could be questioned by nobody." *United States v.*

8. History demonstrates that the conflict between the NAFTA and other federal and local laws is far from hypothetical. For example, a dispute panel under the General Agreement on Tariffs and Trade, commonly referred to as GATT, has recently ruled that the Marine Mammal Protection Act impermissibly restricts Mexican trade in violation of GATT. *See* Plaintiffs' Exhibit C (GATT Panel Report, *United States—Restrictions on Imports of Tuna,* at 40–42, 45–47 (1991)). The Marine Mammal Protection Act is an environmental statute that prohibits tuna imports from countries that use fishing methods that kill dolphins in greater numbers than domestic companies are permitted by the statute. 16 U.S.C. § 1371; *see Committee for Humane Legislation, Inc. v. Richardson,* 414 F.Supp. 297 (D.D.C.), *aff'd,* 540 F.2d 1141 (1976).

9. The Environmental Review was a general study conducted on the possible ramifications of the NAFTA but the Defendant does not contend that it qualifies as an EIS under the NEPA. It does not qualify as a EIS because it does not analyze the effect of the actual NAFTA, or identify and analyze other alternatives. 42 U.S.C. § 4332(2)(C); *see Natural Resources Defense Council v. Morton,* 337 F.Supp. 165 (D.D.C.) (Richey, J.), *aff'd,* 458 F.2d 827 (D.C.Cir.1972) (Leventhal, J.).

10. Such claims include the allowance of pesticides on food imports from Mexico.

*SCRAP,* 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973).[11]

Thus, the Court concludes that standing is proper where allegation of environmental harms to particular members of the Plaintiff organizations are sufficiently concrete.[12]

## VI. REQUIRING THE PREPARATION OF AN ENVIRONMENTAL IMPACT STATEMENT ON THE NAFTA BEFORE ITS SUBMISSION TO CONGRESS IS REQUIRED BY THE CLEAR LANGUAGE OF THE NEPA AND IS CONSISTENT WITH THE POLICIES BEHIND IT.

■ Having determined that the APA and the NEPA apply to the NAFTA, the plain language of the NEPA makes it a foregone conclusion that the OTR must prepare an EIS on the NAFTA.[13] The NEPA requires that all federal agencies "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" an environmental impact statement setting forth the environmental impact of the proposed action. 42 U.S.C. § 4332(2)(C).[14] Furthermore, it is established law that "the policies, regulations and public laws of the United States shall be interpreted and administered with the policies of NEPA 'to the fullest extent possible.'" *Trustees for Alaska v. Hodel,* 806 F.2d 1378, 1382 (9th Cir.1986) (*quoting* 42 U.S.C. § 4332; *citing Lathan v. Brinegar,* 506 F.2d 677, 687 (9th Cir.1974) (en banc)).

■ There is a narrow exception to the NEPA's EIS requirement only where compliance with the NEPA would result in a "clear and fundamental conflict of statutory authority." *Flint Ridge Development Co. v. Scenic Rivers Ass'n.,* 426 U.S. 776, 791, 96 S.Ct. 2430, 2439, 49 L.Ed.2d 205 (1976). However, such an exception is narrowly construed. *See Jones v. Gordon,* 792 F.2d 821 (9th Cir.1986) (a 90–day time limit for issuing permits under the Marine Mammal Protection Act did not excuse compliance with the NEPA's EIS requirement). There is nothing in the fast track procedures or the Trade

11. In addition, the Plaintiffs allege that certain NAFTA provisions will cause a wide variety of other pervasive and adverse environmental effects. For example, they claim that NAFTA's reduction of trade barriers will cause a reduction in prices for domestic agricultural and meat products, thus creating pressure to intensify domestic production methods which will have a detrimental effect on the environment. *See* Plaintiffs' Exhibit A (NAFTA, Chapter 7); Ritchie Affidavit ¶¶ 4–8. In addition, the Plaintiffs allege that NAFTA's energy incentives for oil and gas exploration will encourage the use of nonrenewable energy resources. *See* Plaintiffs' Exhibit A (NAFTA, Chapter 6); Wallach ¶ 65. Finally, they claim that the NAFTA may cause "pollution haven effects" in that domestic companies will move their operations to Mexico to avoid more stringent U.S. environmental laws. *See* Plaintiffs' Exhibit D (Review, Executive Summary at 7). While the Court does not rely on these allegations for purposes of standing, it does note that an EIS would help to clarify the extent and scope of the environmental impact of the NAFTA. *See infra* Section VI.

12. The Court also notes that the Plaintiffs also allege standing on the basis of an injury to their organizational interests by claiming that they are unable to keep their members adequately informed. The Supreme Court has stated that such injury is within the zone of interest that the NEPA was designed to protect. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct.

3177, 111 L.Ed.2d 695 (1990). Such claims of informational standing have been rejected where a plaintiff has been unable to identify any particular agency action as the source of injury. *Foundation on Economic Trends v. Lyng,* 943 F.2d 79 (D.C.Cir.1991) (no EIS required for a federal agency's day-to-day operations). However, the Court is not convinced that such informational standing is wholly improper where the Plaintiffs are challenging a specific proposal for legislation such as the NAFTA.

13. The purposes of the NEPA are to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the *ecological* systems and natural resources important to the Nation...." 42 U.S.C. § 4321.

14. The Court also notes that CEQ regulations require an EIS where federal actions "establish a precedent for future actions with significant effects or represent[] a decision in principle about a future consideration," 40 C.F.R. § 1508.-27(b)(6), or "threaten[] a violation of Federal, State, or local law or requirements imposed for the protection of the environment," *id.* § 1508.-27(b)(10), especially where those effects are "likely to be highly controversial." *Id.* § 1508.-27(b)(4).

laws that specifies that the NEPA shall not apply to the NAFTA. The Court also notes that *other governmental entities, most notably the State Department, prepare EISs for international treaties.* 22 C.F.R. §§ 161.-5(d), 161.7(d)(2) (1992). Furthermore, as the timetable for the NAFTA's submission to Congress is not explicit, the statutes here can be reconciled with the EIS requirement contained in the NEPA.[15]

Finally, the Court notes that the House of Representatives unanimously passed a resolution stating that "Congress will not approve legislation to implement any trade agreement if such agreement jeopardizes United States health, safety, labor, or environmental laws." H.R.Res. 246, 102nd Cong., 2nd Sess. (1992), and that certain Senators have requested that an EIS be prepared on the NAFTA.[16] Such events confirm that Congress is interested in the environmental effects of the NAFTA and would be aided by the preparation of an EIS.

## VII. CONCLUSION

The NEPA, and the policies under it, clearly require that a federal agency prepare an environmental impact statement on every proposal for legislation significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C). The Court finds that the Plaintiffs have demonstrated that there is a reasonable risk that the NAFTA may cause environmental injury and the Court concludes that the actions of the Defendant Office of the United States Trade Representative in negotiating, drafting, and signing the NAFTA are subject to review under the APA and NEPA. Therefore, the Court shall enter summary judgment for the Plaintiffs and order that the Defendant prepare an environmental impact statement on the NAFTA with all deliberate speed.

The Court notes that this agreement was negotiated by President Bush and his Trade Representative Carla A. Hill, and thus this lawsuit should not be construed as a failure of the present Administration. However, such an impact statement is essential for providing the Congress and the public the information needed to assess the present and future environmental consequences of, as well as the alternatives to, the NAFTA when it is submitted to the Congress for approval. *See Natural Resources Defense Council v. Morton,* 337 F.Supp. 165 (D.D.C.) (Richey, J.), *aff'd,* 458 F.2d 827 (D.C.Cir.1972) (Leventhal, J.).

The Court shall enter an Order of even date herewith in accordance with this Opinion.

## ORDER

Before the Court are the parties' Cross Motions for Summary Judgment in the above-captioned case. After careful consideration of the parties' Motions, all the papers filed in this case, and the applicable law, and for the reasons articulated in the Opinion of the Court of even date herewith, it is, by the Court, this 30th day of June, 1993,

ORDERED that the Plaintiffs' Motion for Summary Judgment shall be, and hereby is, GRANTED; and it is

FURTHER ORDERED that the Defendant's Motion for Summary Judgment shall be and hereby is DENIED; and it is

FURTHER ORDERED that the Defendant Office of the United States Trade Rep-

---

**15.** The Defendant argues that requiring an EIS at this juncture will be unduly burdensome because there is inadequate time available for its preparation. However, the Court notes that the OTR could have very easily begun the EIS process earlier in the NAFTA negotiation process and thus any tight timetable for the preparation of an EIS on the NAFTA is entirely the result of the inaction by the prior administration.

In addition, our Court of Appeals noted that Congress retains the power to change its rules governing the fast track process and extend the statutory limit on its consideration of the NAFTA if it wishes to postpone such consideration until an EIS has been prepared. *Public Citizen v. Office of the United States Trade Representative,* 970 F.2d 916, 922 (D.C.Cir.1992). Furthermore, it would be manifestly unjust to deny relief in this case on the grounds that there was inadequate time to prepare an EIS because the Plaintiffs brought their prior lawsuit specifically to ensure that they could obtain judicial review with ample time for the OTR to complete an EIS. *See Public Citizen v. Office of the United States Trade Representative,* 782 F.Supp. 139 (D.D.C. 1992) (June Green, J.); Plaintiffs' Brief in Support of its Motion for Summary Judgment, at 13.

**16.** *See e.g.,* Plaintiffs' Exhibit Z (Letter from Senator Patrick Leahy to Carla A. Hills, dated March 26, 1992, at 3).

resentative has acted contrary to law under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*, by failing to prepare an Environmental Impact Statement on the North American Free Trade Agreement as required by the National Environmental Policy Act; and it is

FURTHER ORDERED that the Plaintiffs shall have a Declaratory Judgment that the Defendant Office of the United States Trade Representative must prepare an Environmental Impact Statement on the North American Free Trade Agreement pursuant to the National Environmental Policy Act, 42 U.S.C. § 4332; and it is

FURTHER ORDERED that the Defendant shall prepare such an Environmental Impact Statement forthwith, and that the Court retains jurisdiction to determine an appropriate schedule for the issuance of the aforementioned Environmental Impact Statement if there is a dispute between the parties as to a reasonable timetable for its preparation; and it is

FURTHER ORDERED that the above-captioned case shall be, and hereby is, DISMISSED from the dockets of this Court.